IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

JEFFREY GRAY et al.,

   Plaintiffs,

   v.                                    CIVIL NO.: WDQ-08-1380

FREDERICK COUNTY, MD, et al.,

   Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

Jeffrey Gray and Tanya Thomas (collectively "the plaintiffs"), individually, and as the next best friends and personal representatives of the estate of Jarrel Gray ("Gray"), sued the Board of County Commissioners of Frederick County, Maryland (the "Board"), and Frederick County Sheriff Charles Jenkins and Deputy Sheriff Rudolph Torres, in their official and individual capacities, for the death of Jarrel Gray. For the following reasons, the plaintiffs' motion for a new trial will be denied.

I.   Background[1]

On November 17, 2007, Gray, a 20 year old man, went to a house party with his friends Sara Ismach, Daniel "J.K.," Jeremy

---

[1] The facts of the incident are taken from the evidence adduced at trial. The parties did not request an official transcript of the trial, but the facts above comport with the Court's notes, recollection, and a draft transcript of the proceedings.

Duvall, and Charles "Chuck" Kahiga. Gray was noticeably drunk. At about 3:00 a.m., Ismach, who did not drink that night, drove the group from the house party to a McDonald's restaurant, then to Gray and J.K.'s neighborhood, Gresham Court East. J.K. immediately went home; the rest of the group ate. Gray did not want to go home, so Ismach, Duvall, and Kahiga got out of the car to encourage him to leave.

At about 4:50 a.m., David Dworak, a neighbor, heard screams and yelling, and looked out his window to see the three men fighting and roughhousing. He watched for about a minute and a half, then moved to another window to watch two of the three men continue fighting. Dworak called the Sheriff's Department to report the fight. Another neighbor, Joyce FitzGerald, called 911 when she saw the fight.

Deputy Torres was at a gas station near Gresham Court East, when he heard the radio call reporting the fight and dispatching Deputies Turvin and Lineham. Torres believed Turvin and Lineham were at the Sheriff's station and knew that many of the other deputies were doing paperwork there. As he was close to the scene, Torres radioed to the station that he would respond to the call and was on his way to the scene.

At 4:59 a.m., Torres reached Gresham Court East. At that time, Dworak saw Ismach driving her car in reverse, and also saw

Torres stop his police car close to the front of her car, blocking her exit.

Torres saw the three men fighting, and ordered them to show their hands and get on the ground. One complied, and one turned and walked away while cursing Torres. Gray continued to stand, and concealed his hands in the front of his pants. Torres displayed his Taser and ordered Gray to show his hands. Torres believed that Gray posed a threat to himself and others near him. He felt unsafe getting too close to Gray, and worried about exposing himself to the other people on the scene, who "could have overtaken" him.

Contrary to Torres's repeated orders, Gray kept his hands in his pants and "verbally defied" Torres's orders by yelling that he would not follow Torres's instructions. Torres pulled the trigger and Tasered Gray for five seconds.[2] Gray fell to the ground, on his stomach, landing with his hands underneath him, near his pockets and belt. Torres ordered Gray to pull his hands out, believing that Gray might be hiding a weapon under him or in his pants or pocket. Gray did not move or otherwise respond. Fifteen or 20 seconds after the first Taser discharge, Torres Tasered Gray a second time, and again told him to remove his hands from under his body. Gray remained motionless. About

---

[2] One trigger pull releases a five second charge from the Taser.

20 seconds after the second discharge, Torres became aware that backup officers had arrived.[3]

After other officers handcuffed Gray's companions, they handcuffed Gray. Gray became unresponsive about 30 seconds after the second discharge, and officers moved him to an ambulance. Attempts to resuscitate Gray were unsuccessful; about two and a half hours after the second discharge, he was declared dead. The autopsy report concluded that Gray died suddenly and, at the time of his death, he was under restraint and had alcohol in his blood. Dr. James Locke, the Medical Examiner who performed Gray's autopsy, concluded that Gray was alive after the second discharge. Dr. Locke could not conclude with certainty that the discharges had caused Gray's death, but he noted that Gray's death closely followed the discharges.

Robert Thomas, a law enforcement consultant, testified that law enforcement officers know that suspects put their hands in their pants when concealing weapons. He testified that approaching a suspect whose hands are hidden in his waistline puts an officer at risk of an assault.

Torres testified that he had been trained in the use of force and operation of Tasers before the incident. He was taught that Tasers were dangerous when near water and flammable

---

[3] According to the Frederick County Sheriff's police call log, the backup officers had arrived earlier, but had not told Torres that they were present.

materials, and that he should not use them on obviously pregnant women, or people who might fall from a dangerous height when Tasered. Frederick County Sheriff's Office policy permitted officers to Taser a person up to three times in succession. Torres had been instructed to use a Taser "when deadly physical force does not appear to be justified and/or necessary," or it is not safe for the deputy to get within arm's reach of the subject. A Taser is classified with pepper spray in his department's categorization of types of force.

On May 28, 2008, the plaintiffs sued the defendants.[4] On August 12, 2008, this Court dismissed the claims against the Board, Sheriff Jenkins, and Deputy Torres in his official capacity. ECF No. 15. On December 10, 2008, this Court granted the Plaintiffs' motion for leave to file a second amended complaint alleging claims under 42 U.S.C. § 1983 against the Board and Sheriff Jenkins.[5] ECF No. 38. On July 17, 2009, the

---

[4] The claims included: (1) survival and wrongful death against all Defendants (Counts I and II); (2) excessive force and police brutality against all Defendants (Count III); (3) assault and battery against Torres and the Board (Count IV); (4) negligent training and supervision against Jenkins and the Board (Count V); (5) intentional infliction of emotional distress against Torres (Count VI); (6) violation of 42 U.S.C. § 1983 against Torres (Count VII); and (7) violations of Article 24 and 26 of the Maryland Declaration of Rights against Torres and the Board (Count VIII).

[5] The second amended complaint alleged: (I) Maryland Survival Act, (II) Maryland Wrongful Death Act, (III) Excessive Force under Maryland law, (IV) Assault & Battery, (V) Negligent

Court granted the defendants' motion to bifurcate the claims against Deputy Torres from those against the Board and Sheriff Jenkins, and for summary judgment for Deputy Torres on the intentional infliction of emotional distress claim; it denied the defendants' motion for summary judgment on the § 1983 claim based on qualified immunity.[6] ECF No. 67.

A jury trial on the claims against Torres was held from January 17 to January 25, 2012.  On January 25, the jury sent a note to the Court stating that it could not agree on all claims.  The Court instructed the jury to keep deliberating, if possible.  Later that day, the jury told the Court it had "reached a consensus," and returned a verdict.  On the Court's initial review of the verdict form, the Court told the parties that it appeared that the jury had decided only one of the pending claims, and if the jury could not agree, the Court would accept the verdict the jury had reached, and grant a mistrial on the remaining counts if necessary.  The Court asked the parties whether they wanted the jury to continue deliberations; counsel for the plaintiffs insisted that the Court take any verdicts the jury had reached.  As the jury foreperson read through the

---

training and supervision, (VI) intentional infliction of emotional distress, (VII) 42 U.S.C. § 1983, and (VIII) Maryland Constitutional Violations.  ECF No. 39.

[6] The Fourth Circuit dismissed the defendants' interlocutory appeal of the qualified immunity decision.  ECF No. 76.

verdict sheet, the Court determined that the jury had made each finding necessary to resolve all claims in favor of Torres.

The jury found that:

- Torres had not violated Gray's right to be free from the use of excessive force;
- Torres had assaulted or battered Gray, but his acts were not a proximate cause of Gray's death, and further, Torres was shielded from liability by the privilege of self-defense or defense of others;
- Gray's estate was not entitled to damages for any of the estate's claims; and
- Gray's parents were not entitled to damages for any of their claims.

ECF No. 115.  The jury could not agree whether Torres's conduct was shielded from liability for Maryland claims because of statutory immunity.  *Id.*  This was the only question on which the jury could not agree.  *See id.*

On February 22, 2012, the plaintiffs moved for a new trial.[7]  ECF No. 127.  The defendants opposed the motion.  ECF No. 128.

---

[7] On February 21, 2012, the defendants moved for summary judgment on the claims against the Board and Sheriff Jenkins based on the judgment for Torres.  ECF No. 126.  The Court granted an extension of time to respond to that motion until 10 days after the Court's decision on the motion for a new trial.  ECF No. 130.

II.  Analysis

The plaintiffs contend that they are entitled to a new trial because (1) "the jury's finding that Torres did not use excessive force was against the weight of the evidence," (2) the jury's verdict is "at odds with applicable law" and will result in a miscarriage of justice, and (3) the verdict was irreconcilably inconsistent.  ECF No. 127 at 4-5.

A.   Standard of Review

Under Rule 59(a), a district court may grant a new trial if: the verdict (1) "is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict."  *Atlas Food Sys. & Servs., Inc. v. Crain Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996).  A new trial is also appropriate to correct an inconsistent verdict.  *Id.* at 598.  In determining whether to grant a new trial, the court may weigh the evidence and consider witness credibility.  *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998).

B.   The Verdict is Not Against the Weight of the Evidence

The plaintiffs contend that the jury's finding that Torres had not used excessive force was against the weight of the evidence.  ECF No. 127 at 4.  They argue that "because [Torres]

did not know if . . . Gray was conscious or not, he could not have reasonably perceived a threat." ECF No. 132 at 3.

The Fourth Amendment protects individuals against unreasonable seizures accomplished by excessive force. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The determination of whether an officer's use of force is reasonable

> requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* at 396. Reasonableness is determined "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

Although "an individual's refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for . . . seizure," *United States v. Burton*, 228 F.3d 524, 529 (4th Cir. 2000) (internal quotation marks omitted),[8] the factfinder must consider all of the

---

[8] In *Burton*, four law enforcement officers serving warrants, who had received no reports or other identifications of Burton, approached Burton while he stood alone using a pay phone. 228 F.3d at 526. One officer, Tracy Burke, identified himself as a policeman and asked for Burton's identification. Burton ignored the officers as they repeated the question. An officer twice asked Burton to remove his hand from his coat pocket, and he did nothing. Three officers remained facing Burton, and Officer Burke moved behind him and grabbed his right hand, reaching into his coat pocket. *Id.*                              (continues)

circumstances at the time force was used, *Graham*, 490 U.S. at 396. Concealing one's hand in clothing, as if to hide something, can support an officer's suspicion that the person is armed, if other circumstances--such as suspicion of violent activity--indicate that the officer may be in danger.[9]

A reasonable jury could have concluded that on the morning of November 18, 2007, Torres was dealing with more than a simple refusal to cooperate. There was evidence that: (1) neighbors had called the police and 911 to report a violent fight in which Gray was involved; (2) Torres had arrived on the scene alone, and was outnumbered by the three men who had been fighting, and another person (Ismach) in a nearby car; (3) in an attempt to

---

The Fourth Circuit concluded that, under those circumstances, the officers violated Burton's right to be free from unreasonable searches and seizures because the officers had no reason to suspect that Burton was engaged in criminal activity, or a disturbance, and the officers could have walked away without serious concern for the safety of themselves or others. *Id.* at 528.

[9] *United States v. Flemming*, 310 F. App'x 894, 898 (7th Cir. 2009) (citing *Burton*, 228 F.3d at 526-28). In *Flemming*, police officer Daniel Cruz went to a high-crime area in response to a late night complaint about an SUV driving through residential yards. Flemming admitted to Officer Cruz that he had driven on the lawns, but was otherwise uncooperative. *Id.* at 895. Officer Cruz frisked Flemming when he noticed that Flemming "held his right hand awkwardly inside his jacket as if he were holding something and told his companion to 'be cool' as they passed the officer." *Id.*

The Seventh Circuit distinguished Flemming's circumstances from those in *Burton* because Cruz had lawful cause to stop Flemming, and "would not have been doing his job if he had let Flemming walk away before the investigation ended." *Id.* at 898.

secure the area and ensure safety for himself, the men, and Ismach, Torres ordered everyone to the ground; (4) rather than comply, Gray hid his hands and yelled that he would not do anything he was told; (5) suspects often hide weapons in the front of their pants, and reach into that area when they intend to use the concealed weapon; (6) the Taser was understood as safer for the suspect than a gun and safer for the officer than fists or pepper spray, which require the officer to be near the suspect; (7) a reasonable officer could have concluded that: (a) after Gray fell from the first discharge, he was conscious and aware of Torres's repeated orders to show his hands, (b) Gray kept his hands hidden to assault Torres when he approached to check on or handcuff Gray, (c) a second discharge was necessary to protect Torres and others, because Gray could have been conscious and concealing a weapon, and approaching Gray without backup officers would have left Torres vulnerable to assault from the others present.

Unlike Burton, who was not suspected of being involved in any disturbance,[10] Gray had been reported in a loud fight with two other men. Torres came to Gresham Court East to secure the area because of the fight, and he was outnumbered by three men. Unlike the officer in *Burton*, Torres had not been patrolling an

---

[10] *Burton*, 228 F.3d at 526.

11

area with other officers, hoping that a person he chose to approach was the subject of an outstanding warrant.[11]

Torres "would not have been doing his job if he had let [Gray] walk away before" securing the area. *Flemming*, 310 F. App'x at 898. He was outnumbered, and a reasonable officer would perceive Gray--who was yelling that he would not obey Torres's commands and had his hands hidden as if concealing a weapon--as a threat to the officers and others' safety. *See id.* at 898. The verdict is not against the weight of the evidence.

    C.   The Verdict will not Result in a Miscarriage of Justice

The plaintiffs argue that the verdict is a miscarriage of justice because it is inconsistent with Fourth Circuit law that "'an individual's refusal to cooperate without more, does not furnish the minimal level of objective justification needed for detention or seizure.'" ECF No. 127 at 5 (quoting *Burton*, 228 F.3d at 528-29).

As discussed above, considering all of the circumstances, a reasonable jury could have concluded that Torres had "more" than a simple refusal to cooperate, and his use of force was justified under Fourth Circuit authority. *See* Part II.B, *supra*. Accordingly, the verdict will not result in a miscarriage of justice; a new trial is not necessary.

---

[11] *Burton*, 228 F.3d at 526.

D. The Verdict is not Irreconcilably Inconsistent

The plaintiffs contend that the verdict is inconsistent because the jury found that Torres did not use excessive force, but had assaulted or battered Gray.[12] ECF No. 127 at 5.

In Maryland, a battery "occurs when one intends a harmful or offensive contact with another without the person's consent." *Essex v. Prince George's Cnty.*, 17 F. App'x 107, 116 (4th Cir. 2001) (quoting *Nelson v. Carroll*, 355 Md. 593, 735 A.2d 1096, 1099 (1999)). A touching as minor as handcuffing a civilian can be a battery unless the civilian consents--though an officer's liability for doing so may be shielded by proper justification or public official immunity. *Id.*

The jury was instructed that it should not find that Torres violated Gray's right to be free from excessive force if Torres used force against Gray, but no more than "the amount of force reasonably necessary under the circumstances." Court's Instruction No. 23. The jury was also instructed that, if it found that Torres had assaulted or battered Gray, it should conclude Torres was shielded from liability if he acted in defense of himself or others and only used "such force as was reasonably necessary" for that defense. ECF No. 115 at 2; Court's Instruction No. 33.

---

[12] The jury found that Torres was not liable for assault or battery because he acted in defense of himself or others. *See* ECF No. 115 (verdict sheet).

The jury apparently concluded that Torres committed a battery on Gray when he intentionally used his Taser on Gray--committing an offensive or harmful contact without Gray's consent. It apparently concluded that Torres used no more force than was reasonably necessary to effect an investigative stop and protect himself or others. The verdict is not inconsistent. *See Clem v. Corbeau*, 98 F. App'x 197, 204 (4th Cir. 2004).

E. The Plaintiffs Have Not Shown Their Entitlement to a New Trial

The plaintiffs also argue that the jury verdict was incomplete, necessitating a mistrial, and the jury's comment that each finding was by "con[s]ensus" meant it was not unanimous. ECF No. 127 at 7.

That the jury noted that it reached each finding by "con[s]ensus" does not undermine the verdict. That the jury reached a consensus--and thus unanimity--on each finding was necessary, as the instructions noted. *See* Court's Final Instruction. Each jury member noted that the verdict was his or hers when polled.

Finally, the Court's initial misreading of the verdict sheet has no bearing on its validity. As the Court noted after the jury foreperson read the verdict, the jury determined all the necessary issues. Accordingly, the verdict is not inconsistent or incomplete, and a new trial is unnecessary.

14

III. Conclusion

For the reasons stated above, the plaintiffs' motion for a new trial will be denied. The plaintiffs will be ordered to respond to the defendants' motion for summary judgment within 10 days of the filing of this Memorandum Opinion and Order.

_____7/10/12_____          _____/s/_____
Date                           William D. Quarles, Jr.
                               United States District Judge